IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEFFREY KLEIN, et al., | : | CIVIL ACTION |
| Plaintiffs | : | |
| | : | |
| v. | : | NO. 04-955 |
| | : | |
| NATIONAL RAILROAD | : | |
| PASSENGER CORP., et al., | : | |
| Defendants | : | |

**O P I N I O N**

STENGEL, J.                                        March 31, 2008

**TABLE  OF  CONTENTS**

I. BACKGROUND ................................................... 2

II. THE PLAINTIFFS' PREMISES LIABILITY CLAIMS ...................... 3
    A. THE CASE AGAINST AMTRAK ................................... 4
        1. The Wanton Misconduct Case Against Amtrak .................. 5
            a. Proof of Actual Knowledge of These Particular Plaintiffs Was
               Not Required by Law  .............................. 5
            b. General Knowledge of a Risk to Trespassers  ............... 6
            c. Catenary Wires: Dangers, Risks, and Amtrak's Knowledge  ... 9
        2. Section 339: Liability for Harm to Trespassing Children ........... 13
        3. Breach of the Duty Owed Under Section 339 .................. 18
            a. Section 339(a): Likelihood of Juvenile Trespassers on Railroad
               Tracks and Boxcars ............................... 18
            b. Section 339(b): Amtrak's Knowledge of Unreasonable Risk .. 20
            c. Section 339(c):"Because of Their Youth" ................. 21
            d. Section 339(d): Balancing the Utility of Maintaining the Boxcars
                on the Tail Track Against the Risk of Injury ............ 23
            e. Section 339(e): Exercise of Reasonable Care  .............. 25
    B. THE CASE AGAINST NORFOLK SOUTHERN ..................... 27
        1. Created or Maintained the Artificial Condition  ................. 27
        2. Knowledge of the Unreasonable Risk of Physical Harm .......... 28
        3. Acting on Amtrak's Behalf ................................. 30

III. THE PUNITIVE DAMAGES AWARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
    A. AMTRAK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    B. NORFOLK SOUTHERN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

IV. AMTRAK AND NORFOLK SOUTHERN: MOTION FOR NEW TRIAL . . . . . . 37
    A. Was the Verdict Against the Great Weight of the Evidence? . . . . . . . . . . . . 37
    B. Admission of Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
        1. Evidence of Prior Electrocution Accidents . . . . . . . . . . . . . . . . . . . . 41
        2. Evidence of Other Trespassers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
        3. Dangers of Catenary Wires . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
        4. Evidence of Plaintiffs' Statements During Settlement Discussions . . . 47
    C. The Court's Instructions to the Jury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
        1. Wanton Misconduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
        2. Section 339 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
        3. Comparative Negligence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
        4. Adverse Inference Instruction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
    D. Due Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

V. DEFENDANTS' REQUEST FOR *REMITTITUR*:  NON-ECONOMIC AWARD OF
    JEFFREY KLEIN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

## I. BACKGROUND

On August 10, 2002, plaintiffs Jeffrey Klein and Brett Birdwell climbed on top of

a laddered freight car owned by defendant Norfolk Southern Corporation ("Norfolk

Southern") while it was parked for the weekend on a tail track owned by defendant

National Railroad Passenger Corporation ("Amtrak") in Lancaster, Pennsylvania.  Once

atop the railcar, the two juveniles were severely burned by arcing electricity emanating

from an energized catenary wire which ran along the tail track and above the cars.

The plaintiffs filed their complaint on March 4, 2004.  Over the next thirty-one

months, the parties went through discovery, dispositive motions, hearings, settlement

conferences, pretrial motions, and motions *in limine*.  On October 2, 2006, I granted the

defendants' motion to bifurcate liability and damages pursuant to Rule 42(b) of the

Federal Rules of Civil Procedure, so that the defendants' liability case would not be

prejudiced by any possible jury sympathy for the plaintiffs' injuries.  Trial began on the

liability phase on Tuesday, October 10, 2006 and lasted for eleven days.  Countless

motions for a mistrial were raised by the defendants.  Most of the issues that the

defendants have raised in these post-trial motions have been previously litigated and

resolved, some more than once.[1]

After a jury verdict in favor of the plaintiffs for $24,227,435.80 in compensatory

and punitive damages, the defendants filed a motion for judgment as a matter of law, or in

the alternative, a new trial and/or a *remittitur*.  After extensive briefing by the parties and

oral argument, I will deny the motion.

## II.  THE PLAINTIFFS' PREMISES LIABILITY CLAIMS

A party is entitled to judgment as a matter of law if "there is no legally sufficient

evidentiary basis for a reasonable jury to find for a party on an issue."  Fed. R. Civ. P.

50(a)(1); see also LePage's, Inc. V. 3M, 324 F.3d 141, 145-146 (3d Cir. 2003).  A court

---

[1]  At trial, Amtrak's counsel was joined by "issues and appeals" counsel whose function appeared to be to preserve, or to create, appellate issues.  Counsel officially entered an Entry of Appearance with the Clerk of Court on October 19, 2006, but was present for the entire trial.  As the trial progressed, many of trial counsel's questions to witnesses and arguments to the court seemed to be coming from the "press box" in the person of the so-called "issues and appeals counsel" (or Amtrak representatives in the gallery).  Certain of these questions and arguments had little to do with the issues before the jury at the time and were likely confusing to the jury.  Ironically, these "issues preservation" questions brought into sharper relief one of the plaintiffs' theories:  that Amtrak was out of touch, unrealistic, and defensive in its assessment of the risks involved in this case.

should grant a motion for judgment as a matter of law "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability."  Id. at 146.

## A.  THE CASE AGAINST AMTRAK

The liability case against Amtrak was not complex.  What was really no more than a premises liability claim was presented to the jury on two uncomplicated theories: (1) the duty of a landowner to a trespasser; and (2) whether the attractive nuisance doctrine applied.

Under Pennsylvania law, a landowner's duty of care to one who enters upon the land depends upon whether that person is a trespasser, a licensee, or an invitee. Micromanolis v. The Woods School, 989 F.2d 696, 698 (3d Cir. 1993)[2] (quoting Carrender v. Fitterer, 469 A.2d 120, 123 (Pa. 1983)).  The plaintiffs were trespassers on land owned by Amtrak.  That much is clear.  The duty generally owed by a landowner to a trespasser is to refrain from willful or wanton[3] misconduct.  Id. (quoting Evans v. Phila.

---

[2]  Micromanolis involved serious neck injuries resulting from a 19 year-old diving into a closed and "winterized" swimming pool.  The Third Circuit affirmed the summary judgment in favor of the defendant, citing the Pennsylvania legal standard that a landowner owes only a duty to refrain from willful or wanton conduct toward a trespasser.

[3]  "Wanton misconduct" occurs when an actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.  It usually is accompanied by a conscious indifference to the consequences, and not a desire to bring

(continued...)

Transp. Co., 212 A.2d 440, 442 (Pa. 1965).  Proof of negligence is not enough.  The plaintiffs never argued that either defendant's conduct was "willful;" they based their case on claims of the defendants' wanton misconduct.

In the post-verdict motion, Amtrak offers three reasons why it is entitled to judgment as a matter of law on the plaintiffs' liability claims: (1) there was no proof of wanton misconduct; (2) it did not owe a duty to the plaintiffs under Section 339 of the Restatement (Second) of Torts (the attractive nuisance doctrine) because the plaintiffs were not child trespassers;  and (3) even if Amtrak did owe such a duty, there was no breach.

### 1.  The Wanton Misconduct Case Against Amtrak

####           a.  Proof of Actual Knowledge of These Particular Plaintiffs Was Not Required by Law

Amtrak is correct on at least one point:  because the plaintiffs were trespassers on its property, it owed them the most limited of duties.  Amtrak's only duty was to refrain from wanton misconduct.  The jury was instructed on this point and was given a definition of "wanton misconduct."  Amtrak's "understanding" of this duty involved a self-serving, and quite incorrect, interpretation of Pennsylvania law:  that its duty arose only if Amtrak discovered that these *particular* plaintiffs had trespassed onto its property

---

[3](...continued)
them about.  Micromanolis, 989 F.2d at 701 (quoting Ott v. Unclaimed Freight Co., 577 A.2d 894, 897 (Pa.Super. 1990); see also Evans v. Philadelphia Transportation Co., 212 A.2d 440, 443 (Pa. 1965).

and were in a position of imminent peril.  This is a misstatement of current Pennsylvania law and of the law of this Circuit.  Actual prior knowledge of the injured person's peril need not be affirmatively established to constitute wanton misconduct.  Evans, 212 A.2d at 443-440;[4] see also Micromanolis, 989 F.2d at 701 (actual prior knowledge of the particular injured person's peril is not required).  Amtrak's lack of "actual knowledge" that Jeffrey Klein and Brett Birdwell, specifically, were on its property and in impending peril that night is not controlling here.  It was enough that Amtrak should have realized that putting the laddered Norfolk Southern car under the energized catenary line, in a densely populated mixed residential-commercial-industrial area, was an unreasonable act in disregard of a known risk that would likely put someone in grave peril.

### b.  General Knowledge of a Risk to Trespassers

_____To prove "wanton misconduct" it was necessary for the plaintiffs to show that Amtrak knew of the risk that led to their injuries.  Amtrak insists that a general knowledge of a risk to any trespasser is insufficient.  This misstatement of the law appears to be based on Amtrak's insistence that Estate of Zimmerman v. SEPTA, 168 F.3d 680 (3d Cir. 1999) controls.  In Estate of Zimmerman, the Third Circuit held that

---

[4] Evans is a 1965 decision of the Pennsylvania Supreme Court involving a man who fell onto Philadelphia's subway tracks, was struck by a subway train, suffered severe injuries, and died nine months later.  The Pennsylvania Supreme Court considered him to be a trespasser (despite noting that he did not voluntarily place himself on the tracks) and established that the defendant's duty to him was only to avoid "willful and wanton negligence."  The court noted: "Manifestly, negligence is not at issue in this case, involving the duty owed to a 'trespasser.'" Evans, 212 A.2d at 446.

6

even though SEPTA knew that homeless people continually trespassed in a particular area, it did not breach a duty to a trespasser who climbed up a catenary tower and received fatal burns.  Estate of Zimmerman, 168 F.3d at 688.  The court held that for purposes of a landowner's duty to trespassers, knowledge of a specific risk cannot be imputed from knowledge of a general risk.  Id.  That is, SEPTA's knowledge of a specific risk, i.e., that a trespasser would climb a catenary structure and be electrocuted, cannot be imputed from SEPTA's knowledge of a general risk, i.e., that homeless trespassers frequently entered the track area.  Id.  Amtrak argues that its knowledge of other persons who suffered electrical contact injuries when they trespassed "decades earlier" (information well known to Amtrak) does not qualify as knowledge of a "specific risk."

There are a few problems with Amtrak's view of this issue.  First, the jury received a correct legal instruction on Amtrak's very limited duty to trespassers.[5]  Second, there

---

[5] My instruction to the jury on this subject was as follows:

> "As I said, there is generally no duty of care to trespassers.  Now this case involves two theories, which could be an exception to this general rule.  One of the theories against Amtrak involves the duty of care owed to an adult trespasser, and this involves a concept called wanton misconduct.  If Amtrak knew, or had reason to know of the presence of trespassers on its property, Amtrak's duty would be to refrain from wanton misconduct, that would necessarily cause injury to trespassers.  Because the plaintiffs in this case were trespassers, they are required to prove that Amtrak was wanton in order to prove liability.  Wanton misconduct is defined as follows: An actor has intentionally done an act of unreasonable character in disregard of a risk known to the actor or so obvious that the actor must be taken to be aware of it, and so great as to make it highly probable that harm would follow, it usually is accompanied by a

(continued...)

was much more than "general knowledge" involved in this case, so the holding in <u>Estate</u> <u>of Zimmerman</u> is not the whole story.  The plaintiffs proved much more than "general knowledge" based upon old, remote incidents.  The jury was given abundant information from which it could reasonably conclude that Amtrak appreciated the specific risk of harm to persons like Jeffrey Klein and Brett Birdwell.  Evidence of pervasive graffiti in the area, reports of other trespassers, the presence of numerous schools in the vicinity, the urban setting suggesting that pedestrian traffic was well known, and Amtrak's long time awareness that teenage boys are inclined to climb parked boxcars were all factors presented to the jury.  While Klein and Birdwell did not, and could not, prove that Amtrak knew they were trespassers and in danger on that evening, they did establish by clear evidence that Amtrak had every reason to know trespassers were regularly on its tracks and that teenage boys were inclined to climb to the top of parked boxcars.

---

[5](...continued)

> conscious indifference to the consequences, and not a desire to bring them about, as such, actual prior knowledge of a particular person's peril is not required.  It is enough that the actor realized or at least has sufficient knowledge of sufficient facts, that would cause a reasonable person to realize that a peril exists for a sufficient time before hand, to give the actor a reasonable opportunity to take means to avoid the injured person's accident. The actor is wanton for recklessly disregarding the danger presented.  That is the definition of wanton misconduct, the term actor in there would be used interchangeably with defendant.  So, it is the defendant that is charged here, as having committed wanton misconduct in connection with the plaintiffs.  Where the plaintiff is an adult trespasser, the plaintiff has to prove, not just negligence but a higher standard, that is that the defendant was guilty or capable of wanton misconduct."  <u>See</u> N.T. 10/23/06 at 142-143.

### c.  Catenary wires: Dangers, Risks, and Amtrak's Knowledge

In truth, the presence of high voltage lines above a parked railroad car and the

phenomenon of arcing electricity are not well known to the public.  These dangers are far

from obvious and Amtrak itself provides the best evidence.  The record of this trial makes

clear that Amtrak regularly educates, and re-educates, experienced employees about the

dangers of catenary wires.  If the dangers were so obvious, why would there be a need to

provide on-going training to experienced employees?

For example, Deborah Lynn Kelley, a block operator at Amtrak since 1986,

testified that she receives eight hours of electrical safety training, known as AMT-2

training, every year.  See N.T. 10/11/06 at *189.  Relevant portions of the deposition of

Robert Verhille, Deputy Chief Engineer for Amtrak, were read into evidence.  Mr.

Verhille testified that any employee who works in electrified territory on a daily basis

must take the AMT-2 training.  See N.T. 10/12/06 at *40.  After the training, the

employees must pass a required examination before being assigned duty in electrified

territory.  Id. at *41.  Amtrak has been requiring its employees to have this training[6] since

---

[6]  The plaintiffs offered the following training exhibits which were admitted into evidence
on October 18, 2006:

Exhibit 6:  A collection of summaries of training materials:

    AMT-2 Training Requirements
    Arcing
    Danger of Catenary Lines/Electrical Wires
    High Equipment and Rail Car roofs

(continued...)

9

its existence in 1976, and the predecessor railroad required the training since the 1930's. Id. at *42.  Mr. Verhille testified that the training lasts four hours.  For Class A employees, the requirement is annual training and examination; for Class B & C employees, the requirement is training and examination every two years.  Id. at *44-45. Even contractors who come onto Amtrak's property are required to take a Contractor Awareness Training Course.  Id. at *49.

Relevant portions of the deposition of Anthony M. Ditzler, Trainmaster for Norfolk Southern at the Lancaster station, were read into evidence.  Mr. Ditzler testified that his employer requires him to take yearly training and an examination.  He and his entire crew have seen a training video on catenary wires, which instructs that there "was lots of voltage" in catenary wires and that employees should avoid those wires.  Upon further questioning, Mr. Ditzler indicated that it was his understanding from the video

---

[6](...continued)
        Minimum Distance from wires
        Other Materials Near Wires/Electrical Apparatus
        Supervision of Others
        Working Near Wires -- Other Guidelines

Exhibit 7:    Amtrak Electrical Operating Instructions, AMT-2, re-issued June 1, 1999
Exhibit 8:    Amtrak Electric Traction Standard Operating Instruction No. 16
Exhibit 9:    Amtrak Electrical Operating Instructions, effective April 29, 1979
Exhibit 10:  Penn Central C.T. 290 Electrical Operating Instructions, effective 1/1/73
Exhibit 11:  PA Railroad C.T. 290 Electrical Operating Instructions, revised 12/15/66
Exhibit 12:  Amtrak Maintenance of Way Employees, Safety Rules and Instructions, effective June 1, 1992
Exhibit 13:  Amtrak Maintenance of Equipment Employees, Safety Rules and Instructions, effective June 1, 1992
Exhibit 14:  National Railroad Passenger Corporation Contractor/Lessee/Agency Employee Safety for Contractors, Course Handout.

that employees were not permitted to climb to the top of the cars.  That prohibition is also one of Norfolk Southern's safety rules.

Terry L. Albright, Transportation Supervisor for Norfolk Southern, testified on cross-examination that Norfolk Southern's annual rules require a refresher course on the operating rules where the Train and Engine Service Employees must review the hazards of electrification, watching training films provided by Amtrak which instruct the employees not to get on top of parked cars under catenary lines.  These employees must also take an annual examination on those rules.  Mr. Albright testified that no matter how much experience an employee has, the training and examination are still required each year.  See N.T. 10/19/06 at *146-149.

On October 12, 2006, the plaintiffs presented three training films to the jury.  The first film was a ten-minute training film produced by Amtrak in connection with its AMT-2 training.  This film discussed the history of the electrification of the railroad's northeast corridor and the construction of its catenary system.  The film then instructed the employees on the required process for de-energizing a line before working in its vicinity.  It stressed that de-energizing catenary lines is a multi-step process and involves several other employees.  Maintaining the proper distance from catenary wires and strict adherence to all related safety procedures were continually stressed during the film.  Pictures of destroyed equipment were then shown as examples of what would occur if the proper procedures were not followed.  See Plaintiffs' Exhibit #1.

The second training film was produced by Amtrak and entitled "High Voltage Demonstration."  This film concentrated on the dangers of arcing electricity, and the necessity of maintaining proper distances from catenary wires.  Failure to follow the required procedures would result in extreme damage to equipment and serious or fatal injuries to contractors or anyone working on Amtrak property.  To emphasize this point, a mannequin dressed as a railroad worker who apparently failed to follow procedures was set ablaze at the end of the film.  See Plaintiffs' Exhibit #2.

The third training film was produced by New Jersey Transit and used by Norfolk Southern.  This film also concentrated on the dangers of working near catenary wires and instructed the employees on the necessary precautions that must be followed explicitly when working near catenary wires.  It stressed that there is no way of telling whether a line is energized, so every line must be treated as though it were energized.  Even when a line is de-energized, an employee must always assume that the line is energized unless it is properly grounded, and a Class A employee is supervising.  For emphasis, a picture of a headstone was shown with the words, "R.I.P. – He ignored TR03 Instructions," and a voice said, "You cannot hide your mistakes, but you can bury them."  See Plaintiffs' Exhibit #3.

The plaintiffs introduced Exhibit 26, entitled "Report to Congress. Railroad – Highway Safety, Part I: A Comprehensive Statement of the Problem."  This document was prepared in November 1971 by the Federal Railroad Administration and the Federal

12

Highway Administration.  In a section with the heading "Catenaries" the report states:

> Catenaries are the overhead wiring systems used to carry
> energy to electric locomotives.  Catenary accidents may or
> may not involve trains.  All of the catenary accidents in the
> sample data involved juveniles and all resulted in serious
> injury or death.  Minor catenary accidents are rare because all
> of them result in severe electric shock, and there is a strong
> probability that a fall from the top of a boxcar will follow.
> While there may be a general awareness of danger associated
> with catenary systems as with power lines, few people outside
> the railroad industry are aware that the electrical potential is
> so great that shocks can result without actual contacting of the
> wire.

Plaintiffs' Exhibit #26 at 2-3 (emphasis added).

No one disputes that the catenary system along Amtrak's track system is largely

unchanged over many years.  The system described in the 1971 Report to Congress is

essentially the system in place today.  In a discussion with counsel during trial about the

relationship between Penn Central Railroad and Amtrak, Paul F.X. Gallagher, Esquire,

representing both defendants stated: "Obviously, I will state for the record that the new

wiring itself is similar to the original wiring."  The court asked: "Was new wiring put

up?" and Mr. Gallagher responded: "Of course there has been no new wiring put up."

See N.T. 10/12/06 at *61.  The plaintiffs proved, really beyond all doubt, that the catenary

lines above the tracks presented an extreme danger which was neither readily discernible

nor widely known.

## 2.  Section 339: Liability for Harm to Trespassing Children

Amtrak's most virulent attack on the fairness of the trial centers on Section 339 of

the Restatement (Second) of Torts.  Its malicious rhetoric about the court's rulings and

the jury's findings on this issue reflects more than a disagreement on the applicable law.

Amtrak's vitriol voices outrage over the fact that Section 339 became part of this case in

the first place.  Amtrak's brief *cum* tirade presents a screen of smoke and fire over an

essentially lukewarm legal position.

The Pennsylvania Supreme Court adopted Section 339 of the Restatement

(Second) of Torts,[7] which superceded and supplemented what was previously known as

the "attractive nuisance" doctrine.  Jesko v. Turk, 219 A.2d 591, 592 (Pa. 1966); Dugan v.

Pennsylvania Railroad Company, 127 A.2d 343, 346 (Pa. 1956); Bartleson v. Glen Alden

Coal Co., 64 A.2d 846 (Pa. 1949)  Amtrak contends that Section 339 was never intended

to apply to "almost eighteen" year-olds like the plaintiffs and insists that plaintiffs'

---

[7] Section 339 provides:
A possessor of land is subject to liability for physical harm to children trespassing
thereon caused by an artificial condition upon the land if
> (a) the place where the condition exists is one upon which the
> possessor knows or has reason to know that children are likely to
> trespass, and
> (b) the condition is one of which the possessor knows or has reason
> to know and which he realizes or should realize will involve an
> unreasonable risk of death or serious bodily harm to such children,
> and
> (c) the children because of their youth do not discover the
> condition or realize the risk involved in intermeddling with it or in
> coming within the area made dangerous by it, and
> (d) the utility to the possessor of maintaining the condition and the
> burden of eliminating the danger are slight as compared with the
> risk to children involved, and
> (e) the possessor fails to exercise reasonable care to eliminate the
> danger or otherwise to protect the children.

Section 339 claim should not have been submitted to the jury.  "Almost eighteen" year-olds are actually seventeen and under Pennsylvania law are minors or children.  No doubt § 339 belonged in this case.  Whether it provided a basis for recovery on the facts of this case was for the jury to decide.

The question for the court is whether Section 339 applies to anyone under eighteen.  Does the use of the term "children" somehow suggest a maximum age limit that is largely blind, but finds its level somewhere under the age of eighteen?  To answer this question, we look to Pennsylvania law which defines a "child" or a "minor" to be any unemancipated person under 18 years of age.  See 23 Pa.C.S. § 5302.

Comment (c) to this section of the Restatement provides guidance and support for the proposition that this section does not impose a strict age limit:

> c.  Children.  In the great majority of the cases in which the rule here stated has been applied, the plaintiff has been a child of not more than twelve years of age. The earliest decisions as to the turntables all involved children of the age of mischief between six and twelve. The later cases, however, have included a substantial number in which recovery has been permitted, under the rule stated, where the child is of high school age, ranging in a few instances as high as sixteen or seventeen years. The explanation no doubt lies in the fact that in our present hazardous civilization some types of dangers have become common, which an immature adolescent may reasonably not appreciate, although an adult may be expected to do so. The rule stated in this Section is not limited to "young" children, or to those "of tender years," so long as the child is still too young to appreciate the danger, as stated in Clause (c).
>
> A few courts have attempted to state arbitrary age limits,

> setting a maximum age of fourteen for the possible
> application of the rule. This usually has been taken over from
> the rule, in these states, as to the presumed capacity of
> children over the age of fourteen for contributory negligence,
> which has in turn been derived from the rule of the criminal
> law as to their presumed capacity for crime. The great
> majority of the courts have rejected any such fixed age limit,
> and have held that there is no definite age beyond which the
> rule here stated does not apply. As the age of the child
> increases, conditions become fewer for which there can be
> recovery under this rule, until at some indeterminate point,
> probably beyond the age of sixteen, there are no longer any
> such conditions.

Amtrak concedes that there are cases across the country which have permitted

recovery to an individual seventeen years of age or older under § 339 of the Restatement.[8]

It argues only that the "overwhelming majority" (Amtrak's words) of cases appear to

deny recovery under this section to teenagers even as old as fifteen or sixteen, especially

for an electrical contact injury.  Many of the electricity cases cited by Amtrak involve a

plaintiff injured after climbing high voltage towers.  The sole purpose of these structures

---

[8]  See Boyer v. Guidicy Marble, 246 S.W.2d 742 (Mo. 1952) (concluding that the age of
the plaintiff is insufficient to justify a holding as a matter of law that the plaintiff is guilty of
contributory negligence); Harris v. Ind. Gen.Serv. Co., 189 N.E. 410 (Ind. 1934) (the fact that the
18-year-old plaintiff was a trespasser did not relieve the defendant from duty of using reasonable
care to protect or guard the dangerous tower where defendant could have reasonably anticipated
that children or other persons might come into contact with it, and when such a contact was
reasonably sure to inflict serious injury in such event); Napierski v. Conn., No. 97-0483779S,
1999 Conn. Super. LEXIS 1657 (Conn.Super.Ct. June 21, 1999) (where the 17-year-old decedent
had almost reached the age of majority, the court could not hold, as a matter of law, that his age
precluded the defendant from owing him a legal duty; there is no set age limit under subsection
(c) of 339); Northup v. Santiago, No. 88-0231532S, 1992 Conn. Super. LEXIS 2370
(Conn.Super.Ct. Aug. 12, 1992) (in determining whether a child is sufficiently old and mature to
appreciate the risk present in a particular situation, his chronological age does not provide a
sufficient basis upon which to render summary judgment).

is to support high voltage lines.  To the public, the dangers of these structures are more

obvious than are the dangers of railroad cars parked under catenary lines.  Amtrak insists

that everyone appreciates the risks of catenary wires and even suggests that I take judicial

notice of the danger of electricity being common knowledge. The level of common

knowledge of dangers associated with electricity is a central issue in this case.  The

suggestion that I resolve the issue by "judicial notice" just cannot be taken seriously.  See

discussion supra, Catenary Wires: Dangers, Risks and Amtrak's Knowledge, Part

II.A.1.c; see also Peterson v. Minn. Power & Light Co., 288 S.W. 588, 589 (Minn. 1939).

As the plaintiffs correctly point out, however, recovery in many of these cases was not

denied due to the age of these plaintiffs, but because the five elements of § 339 had not

been established.[9]

 What we learn from the cases cited by both parties is that the applicability of

Section 339 must be judged on the particular facts of a case.[10]  Whether the section

_____

 [9]  See Glover v. Oakwood Terrace Associated, 816 S.W.2d 43, 46-47 (Tenn.Ct.App. 1991) (recovery denied where the swimming pool in which a 17-year-old was paralyzed was not an attractive nuisance because there was nothing unusual about it and it had no hidden danger); Hollis v. Norfolk Southern Railway Co., 667 So.2d 727, 731 (Ala. 1995) (reaffirming that § 339 dispensed with the common law's arbitrary age limitation, so that children over the age of 14 are no longer presumed to be totally responsible for their own actions, and that that presumption was replaced by a jury question); Barrett v. Forest Preserve District of Cook County, 593 N.E.2d 990, 993-94 (Ill.App.Ct. 1992) (recovery denied where the risk was obvious and the 16-year-old plaintiff should have appreciated and avoided it);  Durham v. Forest Preserve District of Cook County, 504 N.E. 2d 899, 902 (Ill.App.Ct. 1987) (recovery denied where the risk was open and obvious, and the 16-year-old decedent should have been aware and avoided the risk);  Haden v. Hockenberger & Chambers Co., 228 N.W.2d 883, 885 (Neb. 1975).

 [10]  It was for this reason that I denied defendants' motions for summary judgment.  It
<span style="float:right">(continued...)</span>

applies depends on the particular risks involved and the plaintiff's appreciation of those risks.

####             3.  Breach of the Duty Owed Under Section 339

####                 a.  Section 339(a): The Likelihood of Juvenile Trespassers
####                      on Railroad Tracks and Boxcars

Amtrak contends that it can only be liable under § 339 if it had knowledge of a dangerous condition at the exact place where the accident happened.  Jeffrey Klein and Brett Birdwell were injured on top of a parked boxcar along the Amtrak tail track a short distance from the point where the tail track crosses Route 23, known as New Holland Avenue.  The plaintiffs offered no evidence that anyone ever trespassed at this particular place, ever climbed up the steep slope adjacent to the tail track, or even trespassed within 150 yards of the accident site.  Section 339 does not impose such strict geographic requirements on the "place" where the dangerous condition exists.[11]

---

[10](...continued)
seemed clear to me then, and it seems clear to me now, that the facts of this case would determine whether § 339 would provide a basis for recovery.

[11]  As I have held in a previous memorandum in this case, see Klein, et al. v. National Railroad Passenger Corp., et al., No. 04-0955, slip op. at 4 (E.D. Pa. Oct. 11, 2006), Amtrak's insistence on using the "within 150 yards" measuring stick unfairly reduces the holding of a thirty-year-old decision of the Superior Court of Pennsylvania to pure arithmetic.  In Whigham v. Pyle, 302 A.2d 498 (Pa. Super. 1973), the defendant owned a 45 acre tract of undeveloped land where children played with defendant's knowledge and without his objection.  The activity was usually contained to the same field.  One day, a child went 150 yards beyond the field and was injured on a steel rod.  In finding the defendant not liable for the injury, the Superior Court of Pennsylvania held, "Where the undisputed evidence indicates that the area of the artificial condition was some 150 yards from the area of usual child trespass and where there was no evidence of even an occasional past childish frolic into the area in question, the requirements of

(continued...)

18

The plaintiffs' § 339 burden was to prove that "the place" where the dangerous condition existed was one upon which Amtrak knew or had reason to know that children would be likely to trespass.  According to the Comments to § 339 of the Restatement, the possessor of land is under no duty to make any investigation or inquiry as to whether children are trespassing, or are likely to trespass, until he is notified, or otherwise receives information, which would lead a reasonable man to that conclusion.  See Comment (g) to the Restatement (Second) of Torts § 339 (1965).  That is exactly the case the plaintiffs presented to the jury.

The jury saw pictures of graffiti painted on buildings adjacent to the accident site.  From the variety of colors and styles it was clear that more than one person had painted the graffiti.  The "artists" must necessarily have been on Amtrak's property in order to apply the graffiti.  The plaintiffs demonstrated that the only way a person could place graffiti on the track sides of these buildings was to walk on to Amtrak property.  The defendants could not and did not contest this.  From the proliferation of graffiti alone it was clear that trespassing was a common occurrence on Amtrak property in the immediate vicinity of this accident.  In combination with the evidence presented by

---

[11](...continued)
Section 339 of the Restatement have not been met."  Id. at 501.  This holding was clearly not intended to be the general proposition, i.e., a "150 foot rule," for all future trespass actions.  The precise arithmetical distance from the known area of trespass to the location of the injury is not controlling.  The court reasoned that a child who is permitted to enter one part of a parcel of land becomes a trespasser if he enters another part of that land, and in that instance the possessor of land owes no higher duty to a child trespasser than he owes to an adult trespasser.  Id.

Amtrak itself that its conductors had reported the presence of juvenile trespassers on or near the tail track on many occasions during the three year period before the accident, the evidence was sufficient to satisfy this element.

### b.  Section 339(b): Amtrak's Knowledge of the Unreasonable Risk

Amtrak continues to claim that the plaintiffs' accident was unforeseeable. Whether Amtrak had reason to know that the catenary wires posed an "unreasonable" risk of bodily harm and the question of foreseeability were properly before the jury who was presented with a plethora of evidence to support a finding that Amtrak was aware of that risk.  Plaintiffs introduced evidence of Amtrak's attorneys writing about similar accidents and anticipating that more accidents would occur again.  There was evidence of the federal government warning railroads about such risks, and evidence of Amtrak's renegotiating its liability agreement with Conrail to spread the risks of these boxcar catenary wire burn cases.

The jury also heard evidence that it was not imperative that Amtrak park trains on the tail track, or keep high voltage running through the catenary lines while the trains were parked there.  See infra Part II.A.3.d.  That particular location was in a city neighborhood at the intersection of two major streets, close to a large high school.  The trains were placed onto the tail track by diesel locomotives close to the streets with no fence to prohibit the entrance of trespassers.  There was graffiti painted on adjacent buildings.  This evidence was sufficient for a jury to find that Amtrak had to anticipate

the presence of teenagers trespassing on its property.  Nevertheless, Amtrak parked railroad cars with attached ladders on the tail track for days with no warning of the danger of high voltage on the top of the trains.

### c.  Section 339(c):  "Because of Their Youth"

To establish liability under Section 339, the plaintiffs were required to prove that they failed to appreciate the risk "because of their youth."  Amtrak argued at trial that any failure to appreciate the risk had nothing to do with the plaintiffs' "youth."  To Amtrak, it defies common sense that a seventeen year-old would not appreciate the risk involved in climbing on top of a freight train parked underneath wires.[12]

Nevertheless, Amtrak concedes that, although the plaintiffs were aware of the risk of climbing on boxcars and the dangers of electricity, they may have not realized the precise danger of "arcing."  Amtrak insists that the plaintiffs climbed the boxcar anyway "in a spirit of bravado and recklessness."  Amtrak's suggestion that these were two daredevils on top of the train seems far from the truth of this case.  Jeffrey Klein and Brett Birdwell were two boys on a visit to Lancaster exploring the neighborhood on their skateboards.  We do not really know their motivation, but Amtrak's picture of two swashbuckling boys acting in a spirit of "bravado and recklessness" rings hollow.  More

---

[12] Further, it is "virtually inconceivable [to Amtrak] that a jury properly guided by its own common sense and by the law – rather than by irrelevant, highly prejudicial evidence and erroneous instructions as to the law – would conclude that these plaintiffs bore *no* responsibility whatsoever for the accident."  See Defendants' Brief at 14 (citations omitted and emphasis in original).

21

likely, they were curious trespassers who climbed an unguarded, very accessible ladder to the top of a boxcar to take a look around.  These were careless acts to be sure, but there is no suggestion that they had any clue of any danger more than possibly falling off the ladder or the boxcar.

The jury heard testimony that neither plaintiff knew what catenary wires were or understood their risks, especially the risk of arcing.  Jeffrey Klein had ridden a train when he was twelve years old, and Brett Birdwell had only ridden on the subway when he lived in California.  Their families had not discussed high voltage with the boys, and neither boy had been taught in school about catenary lines or even high voltage.  Brett testified that he did not know that catenary wires carried high voltage, and that he saw no warning signs on the night of the accident.

The jury heard expert testimony in the plaintiffs' case concerning the cognitive ability of a young male.  The plaintiffs provided assistance to the jury in understanding and evaluating what Jeffrey Kline and Brett Birdwell were able to perceive and process. Ruben Gur, Ph.D., the plaintiffs' expert, testified that one part of the frontal lobe of the brain does not become fully developed until a person is in his twenties.  That portion deals with making value judgments about actions to be taken and teaches one to act responsibly.  This evidence directly addressed the capacity of a late teenage male to make responsible decisions.  In essence, Dr. Gur offered an expert opinion that the late teenage male brain is not fully developed.  By inference, the jury could conclude that boys the age

of the plaintiffs were in fact "young" in their ability to assess risk.  The jury was presented with credible and convincing evidence that the plaintiffs were not aware of the risk involved in climbing the parked railroad car because of their youth.  Dr. Gur's testimony was uncontroverted.  The defendants produced no evidence to dispute Dr. Gur's opinion.  In the end, the jury was free to accept or reject this evidence in their evaluation of what Klein and Birdwell perceived and understood.

### d.  Section 339(d): Balancing the Utility of Maintaining the Boxcars on the Tail Track Against the Risk of Injury

Amtrak insists that the burden of protecting against catenary wire accidents outweighs the risks to child trespassers, and that the plaintiffs did not prove that the burden of eliminating the danger was slight compared to the risk.  This was an argument properly made to the jury, and the jury was not convinced.  Amtrak cites the testimony of Robert Verhille, Deputy Chief Engineer for Amtrak, who indicated that this was the first time in his thirty years of experience that someone climbed on top of a railroad car parked under an energized wire at the Lancaster location.[13]  He further testified that having the catenary wires continuously energized is the only way Amtrak can ascertain whether the wires are intact, and whether the trains could operate as planned.

However, these cars were not to be parked at the tail track for a few minutes, but for several days.  It was undisputed at trial that all Amtrak had to do was turn off the high

---

[13]  This is the same Robert Verhille who testified about Amtrak's practice of training annually even experienced employees about the dangers of catenary wires.  See supra, Part II.A.1.c.

voltage flowing through the catenary wire above the parked railroad cars during those days the cars were to be parked there.  Power in that line was not necessary for the movement of trains while the trains were parked under it.  In fact, a diesel engine placed the group of railroad cars on the tail track, and removed them when necessary.

The tail track ran parallel to the main track, so de-energizing it would not have affected the power on the main track, or the efficient performance of the regularly scheduled trains.  The jury heard that this was possible from the testimony Richard Thomas Gill, Ph.D., plaintiffs' expert on the properties and safe management of high voltage electricity.  Dr. Gill testified that it would have been much safer for Amtrak to de-energize the catenary wire above the parked railroad cars even without grounding.  Grounding was an additional precaution that Amtrak could have taken after de-energizing of the catenary wire.  Amtrak agreed at trial that cutting off the power above the tail track was possible, but it was complicated.  There was discussion of the need for specialized personnel and the use of long supporting rods or poles.  The point was stated unequivocally: cutting off the power was not as simple as turning a light switch.  The jury heard Amtrak's evidence and argument on this point.  It was for the jury to decide whether the inconvenience of turning off the power in the catenary lines above the tail track outweighed the cost of failing to take this step.

Even if it were necessary to have the high voltage run through the catenary wire at all times, it was not necessary for Amtrak to park trains under the catenary wire.  The risk

could have been avoided by just refusing Norfolk Southern's request to park its railroad cars there.  Parking on the tail track was an accommodation to Norfolk Southern, for which Amtrak was paid.

Amtrak also argues that it would not have been a viable solution to place hazard signs on each of the parked railroad cars because the tail track was used only to park actively-used freight cars on a temporary basis.  Dr. Gill, plaintiffs' expert, testified that at a minimum, Amtrak could have posted "high voltage" warning signs.  In fact, the jury learned that Amtrak realized the need for warning signs.  There was a "No Trespassing" sign on Amtrak property in the vicinity of the parked cars.  It was, however, poorly placed, fifteen feet above the ground and facing the tail track.  It could not have been seen by someone contemplating climbing up the ladder to the top of a car.  It could only have been seen by someone on top of a parked boxcar.  Certainly, some type of permanent sign warning of the dangers of high voltage catenary wires placed in a conspicuous location at the tail track, or temporary signs on parked, laddered railroad cars would have been possible.  The jury was presented with sufficient evidence to determine that the utility to Amtrak of maintaining the condition and the burden of eliminating the danger were slight as compared with the risk to children involved.

### e.  Section 339(e): Exercise of Reasonable Care

Amtrak argues that there was no proof of its failure to exercise reasonable care to eliminate the danger.  Citing a case from the district court for the District of Columbia,

Amtrak argues that it would not have been feasible for Amtrak to operate its Lancaster train business without the catenary wire over the tail track. Edwards v. Consolidated Rail Corp., 567 F.Supp. 1087 (D.D.C. 1983) (the court found it was not possible to de-energize the wires without affecting other trains, so the railroad's actions were reasonable). That case is easily distinguishable, and the same result not warranted. In Edwards, the catenary line was necessary to provide power to enable Conrail to run its interstate trains, and the train in that case was only temporarily stopped for a signal. Id. at 1090. The trains were never stored, loaded or switched in the area of the accident, and there were no side tracks for such purposes. Id. at 1095. Here, the railroad cars were parked under the catenary line on the tail track for several days to accommodate Norfolk Southern. The catenary lines in this case were completely irrelevant to the moving or storage of the freight cars on the tail track. The trains were parked at the tail track by a diesel locomotive. The location of these trains did not interfere with the trains traveling through that area.

Amtrak and Norfolk Southern each derived a benefit for parking the cars on the tail track: Norfolk Southern gained a place to store its cars and Amtrak got paid for the use of its track. The live power lines above the cars served neither purpose. The jury could conclude, and properly so, that maintaining live electrical lines which served no purpose was a failure to exercise reasonable care.

26

### B.  THE CASE AGAINST NORFOLK SOUTHERN

_____Norfolk Southern contends that because it did not own or possess the land, it can only be liable if the plaintiffs proved the elements of Section 386 of the Restatement (Second) of Torts.  As with Amtrak's motion for judgment as a matter of law, Norfolk Southern must prove, at this point, that the evidence was insufficient to sustain the jury's verdict.

Section 386 governs the liability of a "non-possessor" of land, and provides:

> Any person, except the possessor of land or a member of his household or one acting on his behalf, who creates or maintains upon the land a structure or other artificial condition which he should recognize as involving an unreasonable risk of physical harm to others upon or outside of the land, is subject to liability for physical harm thereby caused to them, irrespective of whether they are lawfully upon the land, by the consent of the possessor or otherwise, or are trespassers as between themselves and the possessor.

Norfolk Southern argues that it is entitled to judgment in its favor under § 386 for three reasons: (1) the plaintiffs failed to present sufficient evidence that Norfolk Southern created or maintained the artificial condition that injured them; (2) the plaintiffs failed to present sufficient evidence that Norfolk Southern knew or should have recognized that the artificial condition involved an unreasonable risk of physical harm to others upon or outside of the land; and (3) Norfolk Southern was acting on Amtrak's behalf.

### 1.  Created or Maintained the Artificial Condition

_____The "artificial condition" in this case was the presence of Norfolk Southern's

27

laddered railroad car complete with a catwalk parked underneath the energized catenary line on Amtrak's property.[14]   The jury heard evidence that Norfolk Southern created that condition by seeking permission to park its cars on Amtrak's property, by parking its railroad cars on that tail track under the energized wire, and by using its own diesel engine to move the cars in and out of that location.  In fact, Norfolk Southern paid Amtrak for this accommodation.  This was often done when Norfolk Southern's own yard was filled to capacity.

### 2. Knowledge of the Unreasonable Risk of Physical Harm

The artificial condition created by Norfolk Southern allowed anyone to climb to the top of the railroad car, walk along the catwalk, and unwittingly get within inches of a high voltage line, close enough to be injured by arcing electricity.  This risk was unreasonable because it was not necessary, and could have been averted.  Norfolk Southern did not have to park its cars under an energized high voltage line, in an open area accessible to the public, without signs or warnings of the danger on top of the train's unguarded ladders.  Further, Norfolk Southern could have asked Amtrak to de-energize the line.

---

[14]   Norfolk Southern contends that Amtrak maintained, created, and had control over the condition, not Norfolk Southern.  Amtrak determined whether Norfolk Southern could park its railcars on Amtrak's property, where they could be parked, and for how long they could be parked.  Norfolk Southern is not permitted to park its railcars on the tail track without Amtrak's permission.  Norfolk Southern further contends that the plaintiffs were injured by a catenary wire, not by Norfolk Southern's railcar, and that the railcar itself did not pose an unreasonable risk to the plaintiffs.

_____The jury learned that Norfolk Southern was well aware of the dangers of catenary lines, dangers not understood by the general public.  Anthony Ditzler, Norfolk Southern's Lancaster Trainmaster, testified that like Amtrak, Norfolk Southern continually trained its employees about the dangers of catenary lines including the prohibition on climbing on top of a train underneath a catenary wire.  Norfolk Southern's employees were regularly shown a training film which instructed them, *inter alia*, to stay at least three feet from catenary wires while working, to always be conscious of the dangers while working near electricity, to avoid working near overhead wires unless protected by a Class A employee who will take the necessary precautions for their safety, and to promptly notify other employees who are unfamiliar with electrified territories to keep off the top of all equipment due to the dangers of working under wires.  Terry Albright, Norfolk Southern's Transportation Supervisor, also testified that Norfolk Southern uses Amtrak's training films to instruct its employees on the dangers of catenary wires.[15]

Norfolk Southern obviously finds it necessary and proper to educate regularly its experienced workforce in the danger of catenary wires.  To argue that the general public, or in this case, two teenage boys, should fully appreciate the dangers of getting close to a catenary wire is ridiculous.  The jury heard the evidence on continual training by Norfolk Southern and Amtrak.  The jury saw this defense for what it was: an attempt to hold these plaintiffs, and the public, to a standard that neither defendant applied to its own

---

[15]  See supra note 6 for a list of exhibits of training materials.

experienced and educated employees.

Thus, the jury was presented sufficient evidence to determine that Norfolk Southern was aware of the unreasonable risk it created by parking its laddered railroad cars under high voltage catenary wires in an open urban area accessible to the public and marked with graffiti.

### 3. Acting on Amtrak's Behalf

Norfolk Southern argues it was acting on Amtrak's behalf, and § 386 does not apply to anyone "acting on behalf" of the possessor of land. According to Norfolk Southern, this arrangement was rather one-sided: it placed its rail cars on Amtrak's property solely at the authority, direction, and control of Amtrak, and Amtrak received the benefit of payment from Norfolk Southern for the parking and storage. Norfolk Southern contends it is not liable because it really played no role.

The evidence did not support this assertion. In fact, when Norfolk Southern asked Amtrak for permission to park its railroad cars on Amtrak's property, it acted for its own purposes. Norfolk Southern needed to park its trains there because its own train yard was filled to capacity with other trains. Notwithstanding a payment to Amtrak, Norfolk Southern acted on its own behalf at that time.

## III.  THE PUNITIVE DAMAGES CLAIMS

The jury awarded Jeffrey Klein and Brett Birdwell each $4,375,000 in punitive damages against Amtrak and $1,875,000 in punitive damages against Norfolk Southern.

The defendants contend that the evidence to support the punitive damages award was insufficient.

Except in rare cases, it is the exclusive province of the jury to determine whether to award punitive damages and in what amount.  Donaldson v. Bernstein, 104 F.3d 547, 556-557 (3d Cir. 1997).  A jury's award should only be overturned if it clearly appears that the award exceeded constitutional limits.  State Farm Mutual Auto Insurance Company v. Campbell, 538 U.S. 408, 416 (2003) (few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process).  Nevertheless, punitive damages are recoverable only for torts that are committed willfully, maliciously, or so carelessly as to indicate wanton disregard of the rights of the party injured.  Golden v. Golden, 382 F.3d 348, 356 (3d Cir. 2004).

### A. AMTRAK

Again, Amtrak "spins" the law.  It argues that the plaintiffs relied solely upon the evidence they presented during the liability phase, even though punitives are appropriate only where there has been conduct more egregious than that which merely establishes the underlying tort, citing Geyer v. Steinbronn, 506 A.2d 901, 915 (Pa. Super. Ct. 1986).  Geyer was a defamation case and is not fully representational of Pennsylvania law on punitive damages.  In Geyer, the Superior Court held that knowledge of, or recklessness as to falsity of a publication (that is, "actual malice") is the proper standard for awarding punitive damages in *defamation* cases.  The court reasoned that because punitive damages

31

in defamation actions are in effect a punishment for speech, the formulation of the appropriate standard has been influenced by constitutional considerations.  Id.  That is correct as far as it goes, but this is not a defamation case.  Actual malice is not the standard for punitive damages in Pennsylvania.

Amtrak further insists that Pennsylvania law requires a compelling evidentiary showing to sustain a claim for punitive damages, much more than the one presented here by the plaintiffs, because punitive damages are an "extreme remedy" requiring a showing that the defendant acted in an outrageous fashion.  Phillips v. Cricket Lighters, 883 A.2d 439 (Pa. 2005).

Pennsylvania has adopted § 908 of the Restatement (Second) of Torts and accompanying comments regarding the imposition of punitive damages.  Feld v. Merriam, 485 A.2d 742, 747 (Pa. 1984); see also Dean Witter Reynolds, Inc. v. Genteel, 499 A.2d 637, 643 (Pa. Super. 1985); Delahanty v. First Pennsylvania Bank N.A., 464 A.2d 1243, 1263 (Pa. Super. 1983); Smith v. Brown, 423 A.2d 743, (Pa. Super. 1980); Feingold v. SEPTA, 517 A.2d 1270 (Pa. 1986); Kirkbride v. Lisbon Contractors, Inc., 555 A.2d 800, 803 (Pa. 1989).  Section 908(2) provides:

> Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others.  In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff, that the defendant caused or intended to cause and the wealth of the defendant.

32

Restatement (Second) of Torts § 908(2).

Thus, punitive damages may be appropriately awarded when a plaintiff has established that the defendant acted in an outrageous fashion due to either "the defendant's evil motive or his reckless indifference to the rights of others."  See Martin v. Johns-Manville Corp., 494 A.2d 1088, 1096 (Pa. 1985) (rev'd on other grounds); see also Hutchison v. Luddy, 870 A.2d 766, 770 (Pa. 2005) (finding that punitive damages may be appropriately awarded only when the plaintiff has established that the defendant has acted in a fashion "so outrageous as to demonstrate willful, wanton or reckless conduct").  A defendant acts recklessly when his conduct creates an unreasonable risk of physical harm to another and such risk is substantially greater than that which is necessary to make his conduct negligent.  Id. at 771.  A showing of mere negligence, or even gross negligence, is not enough to prove that punitive damages should be awarded.  SHV Coal, Inc. v. Continental Grain Co., 587 A.2d 702, 705 (Pa. 1991).

This case involved negligence in the Section 339 claims only.  Because the plaintiffs were trespassers, they were required to prove that the defendants' conduct was wanton to establish liability.  This distinction is an important one.  To reach the damages phase of the trial here, the plaintiffs had to prove reckless indifference.  Certainly this liability standard is greater than that of negligence.  See Hutchison v. Luddy, 870 A.2d at 772 (plaintiff in a case sounding in negligence may undertake the additional burden of attempting to prove, as a matter of damages, that the defendant's conduct not only was

negligent but that the conduct was also outrageous, and warrants a response in the form of punitive damages); see also Phillips v. Cricket Lighters, 883 A.2d at 446 (punitive damages should not be meted out to every defendant who is found to have acted negligently; rather, it should be reserved for those cases in which the defendant has acted in a particularly outrageous fashion).  There is a clear distinction between the negligence standard and the punitive damages standard, with a plaintiff being required to meet a far lesser burden to establish a negligence claim than that which is imposed in a punitive damages claim.  Id.

Here, the jury was instructed properly in Pennsylvania's current law regarding punitive damages.[16]  There was certainly sufficient evidence to

---

[16]  My instruction to the jury on the issue of punitive damages was as follows:

> "The next category I want to discuss with you is punitive damages. If you find that the conduct of the defendants was outrageous, you may award punitive damages, as well as any compensatory damages, in order to punish the defendants for their conduct and to deter the defendants and others from committing similar acts.  So, punitive damages are separate and apart from compensatory damages.
>
> Now, we use the term outrageous conduct.  Conduct is outrageous when it is malicious or wanton, or willful, or oppressive, or shows reckless indifference to the interest of others.  Reckless conduct, and I want to define the term reckless conduct for you.  Reckless conduct is intentionally, intentional acting, or failure to act in disregard of a risk to harm of others, that is known or should be known to be highly probable, and with a conscious indifference to the consequences.  Reckless conduct is also acting or failing to act when existing danger is actually known, and with an awareness that harm is reasonably certain to result.

(continued...)

[16](...continued)

In contrast to compensatory damages which are intended to redress the loss the plaintiffs have suffered as a result of the defendants' wrongful conduct, punitive damages are intended to punish the defendants and to deter further wrongdoing.  You must not impose upon the defendants punitive damages based solely on the fact that they are large corporations.

Now, one cautionary instruction, there was testimony in the liability phase of the case about other incidents or other injuries suffered by others in the past, these were incidents that involved minors on railroad cars in the presence of catenary wires in the past at other locations.  These were admitted for the limited purpose of showing notice, or state of mind of the defendants.

The purpose of the claim of punitive damages is to punish the defendants for what happened in this case, if you find that it is appropriate under the facts and the law.  This claim for punitive damages is not to punish the defendants for other conduct in the past, or in other places.  You may consider what the defendants knew about the other incidents as it relates to their knowledge, or notice, or state of mind in this case, but do not base an award of punitive damages on punishment for what happened in the past at other locations.

Now, if you decide that the plaintiffs are entitled to an award of punitive damages, it is your job to fix the amount of such damages.

Under Pennsylvania law, the size of a punitive damages award must be reasonably related to the state's interest in punishing and deterring the particular behavior of the defendant and not the product of arbitrariness or unfettered discretion.  When I talk about the state's interest in punishing and deterring, you the jury, with your knowledge of this case, are acting for the state, when we talk about what is in the interest of the community, that is what we mean when we refer to that in this instruction.

In accordance with this limitation, the standard which punitive damages are measured in Pennsylvania requires analysis of the following factors:  the character of the defendants' acts; and the nature and extent of the harm to the plaintiffs that the defendants

(continued...)

35

sustain the jury's finding that the defendants' conduct was wanton for the reasons

discussed in the sections above.  It was entirely up to the jury to decide whether Amtrak

acted with reckless disregard or whether Amtrak's conduct was outrageous.  The jury had

more than enough evidence to consider and there is no reason to disturb its findings.

**B.  NORFOLK SOUTHERN**

_____Norfolk Southern argues its conduct was neither wanton nor outrageous, and thus

it cannot be held liable for punitive damages.  It stresses that a showing of mere

negligence or even gross negligence will not suffice to establish that punitive damages

should be imposed.  Phillips v. Cricket Lighters, 883 A.2d at 445.

For the plaintiffs to establish liability against Norfolk Southern, they must have

shown that Norfolk Southern created or maintained upon the land a structure or other

artificial condition which it should have recognized as involving an unreasonable risk of

physical harm to others, i.e., that Norfolk Southern was negligent.  The evidence also

supports a finding that Norfolk Southern's conduct was wanton.  The jury considered the

---

[16](...continued)
> caused or intended to cause.  You must determine whether punitive
> damages are to be assessed against each defendant, by that
> defendants' conduct alone.  The amount of any punitive damages
> assessed, must be measured by your consideration of the factors I
> have listed, as they apply to each particular defendant.  The amount
> of a punitive damages award is left to your good judgment, but you
> must not be influenced by passion or prejudice against the
> defendants.  The sole purpose of punitive damages is to punish the
> defendants' outrageous conduct, and to deter the defendants and
> others from similar acts."  See N.T. 10/25/06 at 141-144.

evidence that Norfolk Southern decided to park laddered railroad cars for days at a time in an open area accessible to the public underneath high voltage catenary wires without warnings of the danger.  In this area, there were signs of teenage trespassers with easy access to the tracks.  The jury apparently found this to be a conscious disregard for the consequences of unnecessarily creating a highly dangerous condition, i.e., wanton misconduct.  Thus, I cannot find that Norfolk Southern is entitled to judgment as a matter of law on the plaintiffs' punitive damages claim.  The record supports the jury's finding that Norfolk Southern's conduct under the circumstances was wanton or outrageous.

## IV.  AMTRAK AND NORFOLK SOUTHERN: MOTION FOR A NEW TRIAL

Amtrak and Norfolk Southern base their request for a new trial on several reasons: 1) the verdict against the great weight of the evidence; 2) the admission of irrelevant and highly prejudicial evidence; 3) numerous errors in the jury charge; and 4) due process grounds.  A new trial is appropriate only where a miscarriage of justice would result if the verdict were to stand.  Gagliardo v. Connaught Labs, Inc., 311 F.3d 565, 572 (3d Cir. 2002).

### A.  Was the Verdict Against the Great Weight of the Evidence?

One simple truth of this case is that there was more than sufficient evidence presented in support of each claim.  Another simple truth of this case is that Amtrak and Norfolk Southern really presented no evidence.  Their argument that the verdict was against the "great weight of the evidence" is just intellectually dishonest.  The defendants

presented almost no evidence of any substance.  Instead, they hammered the trespasser

issue at every opportunity, scoffed at the plaintiffs' arguments and wagered that the jury

would join their view that the plaintiffs' case was frivolous.  In their rush to undermine

the plaintiffs, Amtrak and Norfolk Southern took some wildly inconsistent positions.  For

example, they demeaned Klein and Birdwell for their lack of intelligence, judgment and

common sense in choosing to climb to the top of the boxcar.  Yet, they attributed to them

a superior intelligence, a refined sense of deductive logic and an educated sense of

thermodynamics, by arguing that Klein should have appreciated the danger of catenary

wires by virtue of his one trip from Philadelphia to Lancaster on the train and his

occasional trip in his mother's car down New Holland Avenue past the elevated,

unmarked innocuous looking wires along the tail track.  Then, they argued that Birdwell

should have been equally savvy because of his one subway ride at a much younger age.

These were silly arguments, and they gave the lie to much of the defendants' case.  True,

the verdict was against the great weight of the defendants' bluster.  It was not against the

great weight of the evidence.

The defendants also argue that the jury's finding no negligence on the plaintiffs'

part is "frankly, incomprehensible."  In my instructions to the jury, I explained the

concept of negligence.  I explained the limited duty of the possessor of land to a

trespasser as well as the § 339 duty of care to a trespassing child.  The defendants

emphasized the carelessness of the plaintiffs in their questioning of witnesses and in

argument to the jury.  My instructions to the jury included a comprehensive and accurate

discussion of the law of comparative negligence in Pennsylvania.[17]  This jury was fully

informed of the facts and the law as to the plaintiffs' conduct and the elements of

negligence and comparative negligence.  This jury was afforded a full opportunity to

consider the plaintiffs' conduct and to apply Pennsylvania's comparative negligence

statute if they found either plaintiff to be negligent.

---

[17]  My instruction to the jury was as follows:

> "Now, if a preponderance of the evidence does not support the
> plaintiffs' claims, then your verdict should be for the defendants.
> If, however, a preponderance of the evidence does support the
> plaintiffs' claims, you will then consider the defense raised by the
> defendants.  The defendants contend that the plaintiffs were
> negligent and that such negligence was a legal cause or a factual
> cause of the plaintiffs' own injuries.  This is a defensive claim and
> the burden of proving that claim, by a preponderance of the
> evidence, is on the defendants.  If you found that more than one
> party was negligent, and that negligence was a factual cause of
> injury to the plaintiffs, you will have to apportion responsibility
> among all of the responsible parties.

> If you find that both of the defendants were causally negligent, or
> in the case of Amtrak on the one theory, wanton, but that the
> plaintiffs were not, you must apportion responsibility between the
> two defendants by assigning a percentage to each, with the two
> percentages adding up to one hundred percent.  Thus, for example,
> if both defendants were equally responsible, their percentages
> would be fifty percent each.  For a given plaintiff, if you find that
> both the defendants and the given plaintiff were responsible, you
> must apportion the responsibility among the two defendants and
> that plaintiff, again with the percentages adding up to one hundred
> percent.  Again for a given plaintiff, if you find that one defendant
> was responsible, and that the given plaintiff was not, you will not
> have to apportion negligence, because there would be only one
> causally negligent, or in the case of Amtrak on the adult trespasser
> claim, wanton party in the case."  See N.T. 10/23/06 at 150-152.

Certainly, the plaintiffs were responsible for their acts of trespassing that night. They admitted to the jury from the first day of trial that they were trespassers. Plaintiffs' trespasser status is reflected in the limited duty of care owed them by the possessor of land. This limited duty was carefully explained to the jury in the court's charge. The jury verdict likely reflects a finding that the teenage plaintiffs were not responsible for being unaware of the dangers of climbing atop a laddered railroad car parked under a high voltage line, and for being unaware of the phenomenon of arcing electricity. On the other hand, the evidence clearly showed that these risks were well known to the defendants.

## B. Admission of Evidence

The admissibility of evidence turns on a balancing of its probative value against its prejudicial effect. Fed. R. Evid. 401, 402, 403. Under the Federal Rules of Evidence, subject to certain limitations, all evidence is admissible if it is relevant, i.e., if it tends to make the existence or nonexistence of a disputed material fact more probable than it would be without that evidence. Fed. R. Evid. 401, 402. Pursuant to Rule 403, a district court may nonetheless exclude relevant evidence if the probative value of the evidence is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

Rule 403 is an "'umbrella rule' spanning the whole of the Federal Rules of Evidence;" trial judges must apply Rule 403 "in tandem with other Federal Rules under

which evidence would be admissible." See Coleman v. Home Depot, Inc., 306 F.3d 1333, 1343 (3d Cir. 2002). Rule 403 recognizes that a cost/benefit analysis must be employed to determine whether or not to admit evidence; relevance alone does not ensure its admissibility. Coleman, 306 F.3d at 1343. However, "there is a strong presumption that relevant evidence should be admitted, and thus for exclusion under Rule 403 to be justified, the probative value of evidence must be 'substantially outweighed' by the problems in admitting it." Id. at 1343-1344.

### 1. Evidence of Prior Electrocution Accidents

The plaintiffs introduced evidence of electrocution lawsuits against Amtrak through their Exhibit 33. This document contained a description of each case filed against Amtrak as of August 6, 1981 by noting the name of the plaintiff, the injuries suffered, and the circumstances of the incident, e.g., "was playing on top of boxcar." Exhibit 33 was substantially redacted as the result of a motion for a protective Order filed by the defendants during discovery. During discovery, I decided that Amtrak need only produce the report limited to boxcar electrocution lawsuits which occurred in Pennsylvania, Delaware, New York, and New Jersey during the ten years prior to the incident in this case. See Document #14.

The defendants argue that the evidence of prior accidents was irrelevant, highly prejudicial, and should not have been admitted. They insist that the plaintiffs never established a similarity of conditions and facts for any of the prior accident evidence. The

defendants rely on a Third Circuit product liability case which held that evidence of prior accidents cannot be admitted to prove a defendant's notice or knowledge of a dangerous condition unless the proponent of that evidence shows that the prior accidents were substantially similar in time, place, and manner to the accident at issue.  Barker v. Deere & Co., 60 F.3d 158, 162 (3d Cir. 1995).

This evidence was relevant to show Amtrak's knowledge of a risk.  Norfolk Southern had similar knowledge.  The "time, place and manner" argument is misleading. There was never any dispute that the railroad track where Jeffrey Klein and Brett Birdwell were injured, i.e., "the place," was similar in all material respects to any Amtrak railroad track anywhere along the East Coast.  The layout of the tracks, the presence of catenary wires, the lack of fencing, the location of the track in relation to an urban neighborhood – all were common to any Amtrak location whether it was in Washington, Baltimore, Wilmington, Philadelphia, Princeton, New York, Boston, or Lancaster.

The "time" similarity poses no real issue because there has been no real change in the location of tracks, layout of tracks, presence of catenary wires and the practice of parking boxcars in the past thirty years.  The "manner" of the accident or injury was similar in all material respects:  each case described in Exhibit 33 involved young males on top of boxcars who suffered burns from catenary wires.

Evidence at trial demonstrated that the railroad industry, the federal government, and Amtrak had identified injuries from catenary lines as an important accident subclass

prior to 1981.  In 1971, the Federal Highway Administration and the Federal Railroad

Administration authored a report to Congress entitled "Report to Congress: Railroad

Highway Safety, Parts I and II," after an investigation of pedestrian accidents on railroad

rights-of-way.[18]  The report indicated, "All of the catenary accidents in the sample data

involved juveniles and all resulted in serious injury or death. . . .While there may be a

general awareness of danger associated with catenary systems as with power lines, few

people outside the railroad industry are aware that the electrical potential is so great that

shocks can result without actually contacting the wire."  A second report in 1986 written

by the Federal Highway Administration recommended better signing in conspicuous

places to improve trespasser safety from accidents that included arcing from catenary

wires.[19]  In 1981, Amtrak compiled a list of electrocution lawsuits against Amtrak.  The

plaintiffs redacted the list to show to the jury only trespasser injuries from catenary

lines.[20]  On November 17, 1983, Charles Mandolia of Amtrak's legal department wrote an

interoffice memo to recommend a renegotiation of an agreement between Amtrak and

Conrail for injuries and deaths to trespassers.[21]  That agreement had imposed upon

Amtrak liability for all catenary contact accidents which occurred on Conrail freight

---

[18]  This report was admitted as Plaintiffs' Exhibit 26.

[19]  See Plaintiffs' Exhibit 27.

[20]  See Plaintiffs' Exhibit 33.

[21]  See Plaintiffs' Exhibit 30.

equipment.  The memo describes several accidents involving catenary contacts which led to lawsuits, and noted that many other such incidents had occurred with potential lawsuits forthcoming, and that the vast majority of those injured were teenage boys.  That memo precipitated a letter written on June 20, 1984, by Frederick Ohly, Associate General Counsel for Amtrak to Conrail's General Counsel Donald Brinkworth, which detailed Amtrak's proposed changes regarding Conrail assuming complete responsibility for catenary contacts on Conrail equipment.[22]

This evidence confirmed Amtrak's knowledge that electricity from catenary wires has the ability to arc between the line and a person without the person ever having to touch the wire.  The report also observed that few people outside the industry were aware that electricity could arc from catenary wires, and because of this, recommended that cautionary signs be placed at or near the catenary wires to alert people to the risk of electrical shock or electrocution.  This evidence was certainly relevant to show notice to the defendants of this dangerous condition.  It was also relevant to show the defendants' awareness that these dangers were not widely appreciated by the public.  If the defendants knew that the general public, including two young teens, were unaware of arcing, yet left a laddered freight car under a high voltage catenary wire in an area where the general public could be expected to enter, then the jury could have determined that Amtrak's conduct was indeed wanton, and that Norfolk Southern created an artificial condition

---

[22] See Plaintiffs' Exhibit 31.

44

which it should have recognized as involving an unreasonable risk of physical harm to others.

### 2. Evidence of Other Trespassers

The defendants argue that the evidence regarding other trespassers at other locations near the accident was irrelevant and highly prejudicial. They characterize its admission at trial as error. Amtrak insists that the fact that others had trespassed in the past has no tendency to prove that Amtrak realized and disregarded the imminent danger to these plaintiffs in violation of its duty to refrain from wanton misconduct. The defendants further argue that the "other trespasser" evidence has no tendency to show that either defendant had a subjective appreciation of the risk of harm to which these particular persons were exposed.

Proof of trespassers, however, was relevant here to the issue of wanton misconduct. Evidence of other, earlier trespassers, e.g., pervasive graffiti along the Amtrak right of way, proved that Amtrak was aware or would have been aware had it been paying attention, that people walked near, on, or across its tracks regularly. Under the "wanton misconduct" standard, the plaintiffs had to establish that Amtrak disregarded a high probability of harm to trespassers. Under § 339, the plaintiffs had to show that Amtrak knew or had reason to know that the location was a place where minors were likely to trespass. Under § 386, the plaintiffs had to show that Norfolk Southern should have recognized the unreasonable risk of physical harm to others on Amtrak's land.

The plaintiffs produced evidence relating to the demographics of the surrounding area including the presence of stores, schools, residences, and a park, all of which are typically filled with people.  The jury also heard evidence about other trespassers along the tail track, that is, dozens of trespassers including children reported less than a mile in either direction from the accident site and within three years of the accident.  That no report exists regarding a trespasser at the *exact* location who climbed atop a railroad car is not controlling here.  The Third Circuit has made clear that "actual prior knowledge of the particular injured person's peril" is not required.  Micromanolis v. Wood School, Inc., 989 F.2d at 701.  Thus, for plaintiffs to prove liability, it was enough that the defendants should have realized that putting the laddered Norfolk Southern cars under the energized catenary line, in a densely populated mixed residential-commercial-industrial area, was an unreasonable act in disregard of a known risk that would likely put someone in grave peril.

### 3.  Dangers of Catenary Wires

The defendants argue that the evidence of the general dangers of catenary wires was irrelevant and highly prejudicial.  The evidence in question centered on electrical training materials used by the defendants to train their employees and other persons lawfully on the premises.  The defendants insist that these training materials comport with all federal regulations, and satisfy their affirmative duty to warn business invitees such as third-party contractors of known dangerous conditions.  Amtrak must train its employees

46

and business invitees on the dangers of electricity on or near the tracks every two years.

I admitted the training materials as relevant to show the defendants' knowledge of the risk in question, and the general public's lack of such a knowledge.  If Amtrak and Norfolk Southern adult employees and third-party invitees require extensive and repeated training, the general public, including children, cannot be expected to be aware of the risk of catenary wires.  An employee of Norfolk Southern testified that he is aware of the danger of catenary wires because of this continued training his employer requires. Further, the materials reflect the defendants' knowledge of the specific risk of climbing atop of a railcar parked under a catenary wire, and the specific risk of electricity arcing from that wire.  The training materials are, in essence, strong evidence that the defendants recognized the dangers of catenary lines.  That repeated training is necessary tends to show that such dangers are not known or obvious to everyone.  The fact that the training needs to be repeated every two years reinforces plaintiffs' contention that the dangers are not obvious even to those who have already been trained.

### 4.  Evidence of Plaintiffs' Statements During Settlement Discussions

During compromise or settlement discussions, the plaintiffs signed two sworn statements which contained admissions.[23]  I sustained the plaintiffs' objection to the defendants' request to have the statements admitted at trial.  There is no dispute that these statements were made during settlement negotiations.  Federal Rule of Evidence

---

[23]  Brett Birdwell acknowledged in his statement that he saw the wires when he climbed to the top of the railcar.  Jeffrey Klein stated that he did not recall seeing the wires.

408(a)(2) is very clear:  conduct or statements made in compromise negotiations

regarding the claim are inadmissible.  These statements could therefore not be admitted

under Rule 408.

## C.  The Court's Instructions to the Jury

When examining the propriety of a jury charge, a court must look to the "charge as

a whole in light of the evidence to determine if it fairly and adequately submitted the

issues to the jury . . . ."  <u>Pryer v. C.O. 3 Slavic</u>, 251 F.3d 448, 454 (3d Cir. 2001).

According to the defendants, my instructions to the jury, coupled with the erroneously

admitted evidence, gave the jury a distorted view, and permitted the jury to find liability

against the defendants under some sort of heightened negligence standard.

### 1.  Wanton Misconduct

Specifically, the defendants insist that the instructions omitted three key aspects

that were included in Amtrak's proposed charge:  (1) A landowner has no duty to

anticipate trespassers or to prepare its property for trespassers; (2) Wanton misconduct is

ordinarily accompanied by a conscious indifference to the consequences of one's actions,

and exists where the defendant realizes the danger to the plaintiff and then so recklessly

disregards the danger to the plaintiff that there is at least a willingness to inflict injury;

and (3) The requisite knowledge of a specific risk to the particular trespasser cannot be

imputed from knowledge of a general risk of injury.

I instructed the jury using the accurate and unambiguous definition of "wanton

48

misconduct" as provided by the Third Circuit.  <u>Micromanolis v. Wood School, Inc.</u>, 989

F.2d at 701.  To include a collateral issue in the instruction while providing the jury with

what duty a landowner owed to trespassers would have confused them.  For example,

instructing the jury that a landowner had no duty to anticipate trespassers would not have

helped the jury to determine whether the defendants' conduct met the definition of

wanton.  Without that collateral instruction, the jury was able to better focus on the task at

hand.  Furthermore, hearing that a landowner does not have to prepare his property for

trespassers under ordinary circumstances, the jury may have understood that that

landowner may even create a risk so unreasonable that harm to trespassers is highly

probable to follow, yet suffer no liability for doing so when a trespasser has been injured.

Finally, the defendants' third key aspect allegedly omitted in my charge does not

reflect current Pennsylvania law, as described above.  Actual prior knowledge of the

particular injured person's peril is not required.  <u>Micromanolis v. Wood School, Inc.</u>, 989

F.2d at 701.  Thus, its exclusion was not error.

### 2.  Section 339

According to the defendants, my instructions to the jury regarding  § 339 were

erroneous in several crucial respects, requiring a new trial.  Most significantly, the

defendants challenge my interchanging of the words "minors" and "children."  Amtrak

argues that this was "extraordinarily prejudicial" because the comments to the section

make clear that it is not the age of the plaintiff that triggers a landowner's duty, but the

effect of the child's age upon his ability to appreciate the risk involved in the conduct.

I instructed the jury that under Pennsylvania law, the word "child" means an unemancipated person under eighteen.  See 23 Pa.C.S.A. § 5302.  The comments to Section 339 make clear that its application is not limited to young children, or to those of tender years, but applies where the child is still too young to appreciate the danger.  I note that the defendants also interchanged the words "children" and "minors."  The defendants entitled their fifth proposed instruction filed on September 13, 2006, and their sixth proposed supplemental instruction filed on October 10, 2006, "Duty Owed By Amtrak to Trespassers Who Are Minors."

To use "children," "child" or "minors" interchangeably is not error.  Legally, the terms have the same meaning: each refers to an unemancipated person under eighteen years of age.  My instruction on the Section 339 claim was not in error.

### 3.  Comparative Negligence

The defendants apparently believe that I should have given a "comparative wantonness" instruction.  They argue (with no factual basis) that the plaintiffs "were aware of the dangers presented by electricity and that they could be injured by electricity."  Thus, the defendants contend, it was for the jury to determine whether the plaintiffs' conduct was wanton, and my refusal to give a "proper comparative negligence charge" was error.

For the plaintiffs' conduct to be "wanton," the jury would have to find that they

knew of the specific risk and acted in reckless disregard of that risk.  Specifically, there would have to be evidence that the plaintiffs knew they would be injured by high voltage electricity if they climbed upon that railroad car but chose to climb the car anyway. Essentially, the defendants were asking for an "assumption of the risk" instruction. Assumption of the risk under Pennsylvania law requires proof that the plaintiffs knew and appreciated the specific risk of harm and intentionally or recklessly acted despite the risk. Hughes v. Seven Springs Farm, Inc., 563 Pa. 501, 506-508 (2000).  General knowledge of a risk, or knowledge of a general risk, is not enough.  The "wanton or willful plaintiff" instruction is simply another way of characterizing assumption of the risk.  There was not any factual support for either instruction.

The defendants' "presumptively capable of negligence" argument is interesting. Their argument seems to be that the jury should have been told that because Klein and Birdwell were older than fourteen they were presumptively capable of negligence.  This is wrong for two reasons.  First, talk of presumption would mostly confuse the jury. Second, there was never an instruction or argument that they were *not* capable of negligence.  My comparative negligence instruction (N.T. 10/23/06 at *151-152) invited the jury to consider whether either plaintiff was negligent.  This instruction assumed they were capable of negligence and no point was made by anyone to the contrary.  Plaintiffs' counsel never discounted the possibility that they were careless in climbing to the top of the boxcar.  Their negligence, or their ability to be negligent, was never really an issue.

51

### 4.  Adverse Inference Instruction

I gave a standard adverse inference charge to the jury.[24]  The instruction was neutral, and referred to neither the plaintiffs nor the defendants.  It also did not identify which witnesses had not been produced.  The defendants, however, argue that plaintiffs' counsel improperly argued during his closing that the jury should draw an adverse inference because the defendants failed to call certain witnesses.  Specifically, the plaintiffs noted that the defendants had failed to call Richard Dengler, Amtrak's Electric Traction Supervisor.  Defense counsel told the jury twice in his opening that Mr. Dengler would testify.  To point out that the defendants chose not to call a witness who their attorney featured in his opening was entirely proper.  It is also worth noting that the defendants also asked the jury to consider why the plaintiffs had not presented members of the community, such as principals, teachers, students and parents from the neighborhood schools, and other clubs and organizations in the area.

### D.  Due Process

The defendants charge that this trial and verdict fail to withstand scrutiny under the Due Process requirements of the Fourteenth Amendment of the United States Constitution.  They claim that my instructions ignored critical direction from the Supreme Court concerning the constraints imposed on the courts in adjudicating punitive damage

---

[24]  Specifically, I instructed: "Now, members of the jury, where a party has not produced a witness that is under that party's control then you may assume that that witness' testimony would be adverse to the non-producing party."  See N.T. 10/23/06 at *137.

claims.  The Court provided this guidance to avoid the imposition of grossly excessive punishments, and to reflect the Court's concerns over the imprecise manner in which punitive damages are administered.

I granted the defendants' request to file a supplemental brief to address a new Supreme Court decision that, in the defendants' opinion, renders the award of punitive damages unconstitutional.  In Philip Morris USA v. Williams, 127 S.Ct. 1057 (2007), an Oregon jury awarded compensatory and punitive damages to a smoker after it found the defendant engaged in negligence and deceit.  The plaintiff argued that the defendant had caused injury to other smokers who were not parties to the litigation.  The defendant then requested an instruction that the jury not impose punishment for the alleged misconduct toward persons not in the case.  The trial court refused and said to the jury that punitive damages are awarded against a defendant to punish misconduct and to deter misconduct and are not intended to compensate the plaintiff or anyone else for damages caused by the defendant's conduct.  The Supreme Court of Oregon affirmed.

The United States Supreme Court reversed, holding that "the Constitution's Due Process Clause forbids a State to use a punitive damages award to punish a defendant for injury that it inflicts upon nonparties or those whom they directly represent, i.e., injury that it inflicts upon those who are, essentially, strangers to the litigation."  Philip Morris, 127 S.Ct. at 1063.  If the risk of improperly punishing a defendant for conduct toward nonparties is significant – either because for instance, of the sort of evidence that was

introduced at trial or the kinds of argument the plaintiff made to the jury – the trial court

must protect against that risk.  Id. at 1065.

Here, the defendants claim that the plaintiffs relied solely upon the evidence used

in the liability phase in seeking punitive damages against defendants.  This included

evidence of other electrical contact injuries.  The defendants argue that this evidence

invited the jury to punish the defendants for injury to nonparties.

I gave a cautionary instruction, however, which stressed to the jury that evidence

of other injuries in other places was admitted solely to show that the defendants were

aware of the risk, and that it would not be appropriate to award punitive damages to

punish the defendants for past conduct, or conduct in other places:

> Now, one cautionary instruction, there was testimony in the
> liability phase of the case about other incidents or other
> injuries suffered by others in the past, these were incidents
> that involved minors on railroad cars in the presence of
> catenary wires in the past at other locations.

> These were admitted for the limited purpose of showing
> notice, or state of mind of the defendants.  The purpose of the
> claim of punitive damages, is to punish the defendants for
> what happened in this case, if you find that it is appropriate
> under the facts and the law.  This claim for punitive damages
> is not to punish the defendants for other conduct in the past,
> or in other places.

> You may consider what the defendants knew about the other
> incidents as it relates to their knowledge, or notice, or state of
> mind in this case, but do not base an award of punitive
> damages on punishment for what happened in the past at other
> locations.

See N.T. 10/25/06 at *142-143.

Furthermore, the Supreme Court established factors to be considered in determining the constitutionality of a punitive damages award:

> The degree of reprehensibility of the defendant's conduct; the disparity between the harm or potential harm suffered by the plaintiff and his punitive damages award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases.

BMW of North America, Inc. v. Gore, 517 U.S. 559, 575 (1996).  A review of these factors as applied to this case demonstrates that the jury's punitive damage award meets Due Process requirements.  The jury found that the defendants had created a danger they knew or should have known could severely injure others, including children.  This was highly reprehensible and certainly satisfies the test in BMW v. Gore.

The Supreme Court endorsed punitive damages that do not exceed a single-digit compensatory to punitive damages ratio.  State Farm Mutual Auto Insurance Company v. Campbell, 538 U.S. at 425.  Here, that ratio for Jeffrey Klein is 0.56, and for Brett Birdwell, it is 10.6.  Jeffrey Klein's ratio does not exceed single digits, and Brett Birdwell's ratio does not exceed single digits to a significant degree.

After careful review, I find that sufficient evidence was presented to the jury to support the plaintiffs' punitive damages award against the defendants.  Thus, a new trial of those claims is not required.

## V.  DEFENDANTS' REQUEST FOR *REMITTITUR*:
##     JEFFREY KLEIN'S NON-ECONOMIC DAMAGES

The defendants argue that, although Jeffrey Klein's non-economic injuries were significant, the jury's $9 million award for his past and future pain and suffering, humiliation, loss of enjoyment of life, and disfigurement is excessive under Pennsylvania law.  The defendants contend that this "plainly excessive" award requires *remittitur* to a sum that amounts to fair and reasonable compensation for Klein's non-economic damages.

A *remittitur* is only for the exceptional case, where the court can comfortably conclude that no reasonable jury could have awarded the damages in question, i.e., that the verdict is clearly unsupported by the evidence.  Starceski v. Westinghouse Electric Corp., 54 F.3d 1089, 1100 (3d Cir. 1995).  The issue for the court to decide is only whether there is a rational relationship between the specific injury sustained and the amount awarded.  Gumbs v. Pueblo Int'l, 823 F.2d 768, 773 (3d Cir. 1987).  Only where the award is so grossly excessive as to shock the judicial conscience is a *remittitur* appropriate.  Keenan v. Philadelphia, 983 F.2d 459, 469 (3d Cir. 1992) (quoting Gumbs v. Pueblo, 823 F.2d at 771).  A district court may not vacate or reduce the award merely because it would have granted a lesser amount of damages.  Motter v. Everest & Jennings, Inc., 883 F.2d 1223, 1230 (3d Cir. 1989).  The size of the award alone is not enough to prove prejudice and passion.  Evans v. Port Auth. of N.Y. & N.J., 273 F.3d 346 (3d Cir. 2001) (quoting Hurley v. Atlantic City Police Depart., 174 F.3d 95, 114 (3d Cir.

56

1999)).

Here, the jury was presented evidence that Jeffrey Klein suffered second and third-degree burns over 75% of his body, extending from his left ear to his knees, including his genital area.  Jeffrey Klein's testimony, and the testimony of his father, mainly, established *beyond any doubt*, that he experienced excruciating pain, that he endured seventy-five days in Temple University's Burn Unit, that he underwent nineteen surgeries including fourteen skin grafts, thirty-five large dressing changes, eight medium or small dressing changes, and daily painful physical therapy sessions during that time.  The jury watched a short video of one of these physical therapy sessions, taken two months after the accident.  The video depicted a young man in a great amount of pain trying to perform basic movements in an attempt to sit in his wheelchair.  After Jeffrey Klein's stay at the burn unit, he endured more surgeries to relieve the tightness of his scarred skin.  He continues to need further surgery for reconstruction of his ear and his penis.

Currently, to manage his constant pain, Jeffrey Klein takes pain medication and applies pain patches.  Because the non-burned portion of his body was used to harvest skin for his skin grafts, most of his body is scarred.  The evidence also provided some glimpse into the humiliation and embarrassment Jeffrey Klein faces on a daily basis because of his scarred body.

The defendants insist that the amount the jury awarded to this young man "so shocks the sense of justice as to suggest the jury was influenced by partiality, prejudice,

mistake or corruption." Haines v. Raven Arms, 640 A.2d 367, 369 (Pa. 1994).  In Haines, thirteen years ago, the Pennsylvania Supreme Court upheld a *remittitur* of the jury's pain and suffering award from $8 million to $5 million, reasoning that the child was not in pain, could relate to her family, went by herself to remedial classes, and could carry out some activities.  The Supreme Court also stressed that the child was not "in the same class as someone who is a quadriplegic or in great pain that cannot be treated."  Id.

I cannot say that the verdict is clearly unsupported by the evidence.  In fact, the evidence of Jeffrey Klein's pain and suffering, loss of enjoyment of life, disfigurement and humiliation was compelling.  There was strong and persuasive evidence of his horrific injuries and of the long and painful treatment he has endured.  The scope and duration of Jeffrey Klein's injuries warranted a very substantial award of non-economic damages.  This was far beyond what a jury sees in a routine personal injury trial.  There is no formula for non-economic damages.  The jury was instructed to make a fair assessment of Jeffrey Klein's damages based upon the evidence.  Our only inquiry at this point is whether the evidence supported the jury's evaluation.  It certainly did and there is no legal or factual basis for a *remittitur*.

Experts at trial estimated that Jeffrey Klein's life expectancy is fifty-four more years.  He has already lived over four years since the accident.  Dividing his non-economic damage award by fifty-eight, his damage award would come to $155,172.41 per year.  The award is not so grossly excessive as to shock the judicial conscience to

require a *remittitur*.  Thus, because there is a rational relationship between Jeffrey Klein's injuries and the jury amount, I will deny the defendants' request for *remittitur*.

An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JEFFREY KLEIN, et al.,** | : | **CIVIL ACTION** |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | **NO. 04-955** |
| | : | |
| **NATIONAL RAILROAD** | : | |
| **PASSENGER CORP., et al.,** | : | |
| **Defendants** | : | |

## <u>O R D E R</u>

**STENGEL, J.**

    **AND NOW,** this 31st day of March, 2008, upon consideration of the defendants' motions for judgment as a matter of law, or in the alternative, a new trial and/or *remittitur* (Documents #178 and 179), the plaintiffs' response thereto, and after a hearing on the motions, it is hereby ORDERED that the motions are DENIED.

    The Clerk of Court is directed to mark this case closed for all purposes.


                    BY THE COURT:


                    /s/ Lawrence F. Stengel

_____ LAWRENCE F. STENGEL, J.